IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


WILBERT ELLIS,              )
                           )
      Plaintiff,            )
                           )       CIVIL ACTION NO.
      v.                    )       2:05cv791-MHT
                           )           (WO)
CITY OF MONTGOMERY,         )
                           )
      Defendant.            )


OPINION

Plaintiff Wilbert Ellis has filed this 42 U.S.C.
§ 1983 action against defendant City of Montgomery,
Alabama, claiming that his right to 'procedural due
process' under the Fourteenth Amendment was violated when
the city failed to provide him with notice before
demolishing his house.[1]  Jurisdiction is proper under 28
U.S.C. §§ 1331 and 1343.  After denying the parties'

_____

1. Ellis originally named the mayor and city council
as additional defendants and alleged additional claims
under the takings clause of the Fifth Amendment and the
substantive component of the due process clause of the
Fourteenth Amendment.  Without objection, the court has
since dismissed those defendants and claims.

cross-motions for summary judgment, the court heard this matter in a non-jury trial conducted on November 3, 2006. Based on the evidence presented at a bench trial, the court finds in favor of Ellis.[2]

## I. FACTUAL SUMMARY

On May 18, 2004, a city inspector was dispatched to 29 Wade Street in Montgomery, Alabama, to investigate a complaint of an unsafe structure.  The inspector observed that the house at that address had been partially destroyed by fire and was in unsafe condition.

Following standard procedure as established by municipal ordinance, see Montgomery, Ala., Ordinance No. 10-2001, the city accessed county tax records to identify the owner of the property and then sent the owner notice that the house was declared to be unsafe and a public nuisance.  Receiving no response from the owner of the

---

2.  The parties agreed that, so as to save time, the court could consider not only evidence presented at trial but also the evidence submitted by the parties with their cross-motions for summary judgment.

property within ten days, the city sent another notice on
June 2, 2004, advising the owner that, if the nuisance
was not abated within 30 days, or if the owner did not
request a hearing within that period of time, then the
city council would authorize demolition of the structure
at a hearing on July 6.

Although the property owner never responded to the
June 2 notice, the July 6 city council hearing was pulled
from the agenda because the city lacked funds to carry
out the demolition.  It was not until November 17 that
the city mailed a new letter in an attempt to provide
notice that the house was a public nuisance and that
demolition would be authorized by the city council at a
hearing on December 21, 2004.

Unbeknownst to the city, ownership of the property
had changed hands between the mailings of the two
notices.  The city correctly identified the owner of the
house as Dorothy Walters before sending the May and June
notices, but probate records reflect that Walters's

3

property was foreclosed upon by its mortgagee and sold to a finance corporation on September 3, and sold again to Ellis on October 6, 2004.  These transactions were duly recorded in the county probate office, but the county's public tax records at the revenue commissioner's office did not reflect the change.  The city assumed the property was still owned by Walters when it mailed the new, November notice to her, not Ellis.  Consequently, when Ellis visited his property at 29 Wade Street on March 18, 2005, he discovered that the house had been demolished.

## II.  DISCUSSION

Ellis has sued the City of Montgomery for violating his procedural due process rights under the Fourteenth Amendment, as enforceable through 42 U.S.C. § 1983.  The court will first analyze the due process claim and then address municipal liability under § 1983.

4

## A. Procedural Due Process

Any procedural due process analysis must begin with a three-step inquiry.  First, did the plaintiff have a constitutionally protected property interest?  Second, did the government deprive the plaintiff of that interest?  Third, did the government employ constitutionally adequate procedures prior to the deprivation--that is, did the plaintiff receive the process he was due?  <u>Zipperer v. City of Fort Myers</u>, 41 F.3d 619, 623 (11th Cir. 1995); <u>see also</u> <u>Logan v. Zimmerman Brush Co.</u>, 455 U.S. 422, 428 (1982) (describing an analytically similar two-step inquiry).

In this case, the first two questions are easily answered in the affirmative.  It is indisputable that real property is protected by the due process clause and that for the government to demolish one's property is to deprive him of it.  <u>Fuentes v. Shevin</u>, 407 U.S. 67, 86 (1972) ("Any significant taking of property by the State is within the purview of the Due Process Clause.").  It

5

is also uncontested that Ellis was the owner of the property the city demolished at the time demolition took place.  The only question of consequence is whether the procedures employed by the city before demolishing Ellis's house were fair and adequate under the Constitution.  See United States v. Salerno, 481 U.S. 739, 746 ("[G]overnment action depriving a person of life, liberty, or property ... must ... be implemented in a fair manner."); see also McKinney v. Pate, 20 F.3d 1550, 1561 (11th Cir. 1994) (en banc).

More specifically, this is a case about notice.  It has been more than half a century since the Supreme Court declared, in the landmark case of Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950): "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their

objections."   339 U.S. at 314.   In cases where the constitutional adequacy of notice is challenged under the due process clause of the Fifth or Fourteenth Amendments, Mullane remains controlling.   Dusenbery v. United States, 534 U.S. 161, 167-68 (2002); Arrington v. Helms, 438 F.3d 1336, 1349 (11th Cir. 2006); Grayden v. Rhodes, 345 F.3d 1225, 1242-44 (11th Cir. 2003).

Upon due consideration of all the evidence in this case, the court does not believe that the city employed constitutionally adequate notice procedures before demolishing Ellis's house.   Unlike in Mullane, there is nothing wrong with the means of notice employed.   See Dusenbery, 534 U.S. at 169 (observing that notice by certified mail is generally adequate for known addressees).   Rather, the constitutional deficiency in the city's notice lies in its procedure for identifying the proper recipient of the notice.   Several considerations guide the court to its conclusion.

7

1.

First, by using the public records of the county revenue commissioner to identify the property owner, the City of Montgomery did not employ notice procedures "reasonably certain to inform those affected" by its action. <u>Mullane</u>, 339 U.S. at 315. According to unopposed testimony at the bench trial of this case, the revenue commissioner's public records could lag behind in reflecting a change in property ownership by as much as two years. Residential property changes hands often enough such that it was not reasonable for the city to believe that the public records of the county revenue commissioner accurately reflected the current ownership of any given property. By sending notice to the property owner in the revenue commissioner's public records, the city could not have been reasonably confident it was sending notice to the person whose interests were affected by the demolition.

During the bench trial of this case, the court heard testimony from Dorian Brunson, the city's chief building official, and Sarah Spear, the county's revenue commissioner. Brunson, the city official responsible for demolition of unsafe structures, stated his belief that the revenue commissioner's records were approximately nine months behind in reflecting the actual owner of the property as recorded in the county probate office. Although Brunson evidently believed the time lag in recordkeeping at the revenue commissioner's office was less than a year, his testimony demonstrates that the city was aware that it consulted out-of-date property records to identify the property owner.

Revenue Commissioner Spear testified that, in fact, the property records available to the city at the time Ellis's house was declared unsafe could be as much as two years out of date. When a new deed was recorded, the office of the probate judge would notify the office of the revenue commissioner within one to two weeks.

Frequently, the new owner would also notify the revenue commissioner in order to obtain a receipt for tax purposes.  However, the change of ownership would not become relevant for tax and revenue purposes until the next first day of October, when the property would be assessed for taxes for the following year.  And even then the public records would not reflect a change of ownership until the collection date of the <u>following</u> first day of October.  This means that, if a piece of property changed hands on October 2, 2004, the new owner would not be identified in the public records of the revenue commissioner until October 1, 2006, nearly two years later.

In this case, a finance corporation purchased the Wade Street property from Walters's mortgagee in September 2004, and sold it to Ellis in October 2004. The revenue commissioner received actual notice of Ellis's purchase on October 14, 2004, when it received a copy of the deed from the probate office.  However, as

10

late as September 30, 2005, Walters was still listed by
the revenue commissioner as the owner of record.   And,
because Ellis did not purchase the property until after
October 1, 2004, he would not have been identifiable
through the revenue commissioner's records until October
1, 2006--nearly two full years after he purchased the
property.   Such a system may be perfectly well-suited to
tax assessment and collection in Montgomery County, but
it is plainly inadequate as a means of identifying the
present owner of an unsafe structure in order to notify
that person before tearing it down.

Revenue   Commissioner   Spear   testified   that   the
computer records in her office have recently improved,
such that the city now has access to the "future records"
of the revenue commissioner.   In other words, the revenue
commissioner's actual notice of a change in ownership,
though not relevant for tax purposes until the next first
day of October, is now immediately reflected in computer
records that the city can access.   Undoubtedly, this is

11

a remarkable and much-needed improvement.  It does not, however, change the lamentable fact that, at the time Ellis's house was razed, the city's practice was to rely on out-of-date property records for the purpose of giving notice to property owners before demolishing unsafe structures.

Mullane requires that "notice [be] reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action," 339 U.S. at 314, and that it be "reasonably certain to inform those affected," id. at 315.  Given the frequency with which real property changes hands, and the lag time before such a change is reflected in the revenue commissioner's public records, it is clear that the city's notice procedure, at the time Ellis's property was condemned and demolished, did not meet that standard.

2.

Second, the city could easily and inexpensively avail itself of procedures that are "reasonably certain to inform those affected" by its action.  <u>Mullane</u>, 339 U.S. at 315.  In Alabama, as in most States, transfers of land and encumbrances on land are recorded in the probate office; future interest-holders are then said to be on 'record notice' when real property undergoes a change in ownership or becomes encumbered.  <u>See generally</u> 1975 Ala. Code §§ 35-4-50 to -113 (recording statutes); -130 to -139 (lis pendens).  The city could have made use of the recording system in a case such as this one.  The city could easily employ procedures under the recording system to meet the due process requirement that its efforts be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action."  <u>Mullane</u>, 339 U.S. at 314.

a.

Instead of consulting out-of-date public records from the revenue commissioner's office, the city could search title in the county probate office prior to demolishing a building in order to discover who owns the property at the time notice is sent out.  Under Alabama law, and according to uncontroverted testimony at trial, the records of the probate office, not those of the revenue commissioner, are authoritative as to who owns a piece of property at any given time.  See 1975 Ala. Code § 35-4-50.  Whenever a new property owner records her purchase as required by law, the city itself is then on 'record notice' of a change in ownership.  See 1975 Ala. Code § 35-4-51.  In other words, were the city to check property records in the probate office when it sends notice of a city council hearing and pending demolition, it would discover who owns the property at the time notice was being sent.

14

Admittedly, the city cannot be expected to conduct a title search the day before demolition takes place, or have agents simultaneously standing by in the probate office and at the demolition site just in case a last-minute transfer of property should occur.  "[T]he Due Process Clause does not require such heroic efforts by the Government."  Dusenbery, 534 U.S. at 170.  Instead, the city's notice procedure need only be "reasonably calculated to apprise the party of the pendency of the action."  Id. (citing Mullane, 339 U.S. at 314); see also Cuvillier v. Rockdale County, 390 F.3d 1336, 1339 n.8 (11th Cir. 2004).

The city's notice procedure would be "reasonably calculated" to inform the person whose interests are affected by the demolition if, in addition to searching title in the probate office before sending notice to the property owner, the city were to take some additional measures to ensure that subsequent purchasers are on notice of pending demolition proceedings.

15

**b.**

For instance, the city could itself record, in the probate office, notice of the pending demolition proceedings.  That way, any subsequent purchaser of the property would be on record notice that demolition could occur.  Once notice from the city becomes a part of the public record, properly filed with the probate office, the city would be under no further obligation to ensure that the property did not change hands prior to demolition.  "[A] purchaser or other person to whom notice is imputed by recordation is presumed to have examined the records in the office of the judge of probate."  Jesse P. Evans III, <u>Alabama Property Rights & Remedies</u> § 5.4[e], at 5-16 (3d ed. 2004).

This type of procedure is widely recognized under the law of <u>lis pendens</u>.  Under Alabama law, upon commencement of any civil action involving an interest in real property, the party instituting the action must file notice of it in the probate office.  1975 Ala. Code § 35-

16

4-131.   Subsequent purchasers and interest-holders are protected from the pending action if lis pendens notice is not filed; and they are deemed to be on record notice of the pending action if it is.   Id. § 35-4-135.   In other States, the commencement of demolition proceedings is accompanied by a lis pendens filing.   See, e.g., Price v. United States, 46 Fed. Cl. 640, 648 (2000) (because defendant city had recorded notice of lis pendens prior to property sale, plaintiff's claim not to have knowledge of pending demolition proceedings was rejected); Continental Paper & Supply Co. v. City of Detroit, 545 N.W.2d 657, 662 n.6 (Mich. 1996) (Mallett, J., dissenting) (describing the process by which the city, prior to demolishing a building declared unsafe, "filed a lis pendens to notify interested parties that legal proceedings had been commenced").

Here, there is no need for the court to conjecture as to whether a lis pendens filing is required as a matter of state law when demolition proceedings occur before

city council as set out in 1975 Ala. Code §§ 11-40-30 to
-36 rather than pursuant to the formal filing of a civil
action in state court.   See 1975 Ala. Code § 25-4-131.
The above discussion of the lis pendens doctrine merely
serves to demonstrate how common it is, and how easy
would it be, for the municipal authority to utilize the
recording statutes as a means of complying with the due
process clause.   A simple lis pendens filing after
sending notice to the current owner of a property would
place subsequent purchasers on record notice that
demolition could occur.

### c.

Additionally, if the city issues notice for a second
time because the previous city council hearing has been
pulled from the agenda and the previous findings of the
building inspector have expired, the city could search
title again in order to find out whether the property has
changed hands since the first notice was issued.

18

According to Montgomery, Ala. Ordinance No. 10-2001, "A failure by the City Council to act on the findings of the Building Official within ninety (90) days from the date notice of same were first given to the property owner shall constitute a vacation of the Building Official's findings."   Ordinance No. 10-2001 at C(2).   Of course, the city is free to reinitiate proceedings after the 90-day time limit has run, and it did so in this case. Under the court's reading of the ordinance, restarting proceedings would also entail re-checking the property records, and Chief Building Official Brunson's trial testimony confirms this is the city's ordinary practice.[3]

_____

3.   Brunson  admits  he  does  not  know  if  his subordinates actually checked the revenue commissioner's property records again in November 2004, but the court is willing to give the city the benefit of the doubt and assume the city followed its regular procedures.   Of course, the city's failure to follow its own procedures would not itself constitute a violation of due process under the Federal Constitution.   See Smith v. Georgia, 684 F.2d 729, 732 n.6 (11th Cir. 1982).   Nor would compliance with state law or city ordinance insulate the city from liability under the due process clause.   See Vitek v. Jones, 445 U.S. 480, 490 n.6 (1980) (quoting Arnett v. Kennedy, 416 U.S. 134, 167 (1974) (Powell, J.,

(continued...)

Even if the city were to file a <u>lis pendens</u> notice with the probate records when the first notice is issued, the terms of Ordinance No. 10-2001 suggest that such notice would not be valid for more than 90 days. Therefore, under the terms of the ordinance, subsequent purchasers would be on record notice of pending demolition proceedings only if they attempted to purchase the property before the building official's findings expired.[4]  Accordingly, placing new owners on notice of

_____

(...continued)

concurring)); <u>see also</u> <u>Logan</u>, 455 U.S. at 432.  To the contrary, following regular procedures in this case would make no difference as to whether Ellis would receive notice; whereas, had the city checked <u>probate</u> records in November 2004, rather than the revenue commissioner's records, it would have discovered that Ellis, not Walters, owned the property it planned to destroy.

4.  In fact, the International Property Maintenance Code, which the City of Montgomery adopted as city ordinance in 2003, prohibits the sale or transfer of any property then under a "compliance order" from the municipality.  Int'l Prop. Maint. Code § 107.5 (2003).  Of course, when the building official's findings expire at the end of 90 days, this prohibition is no longer operative.  Therefore, in this case, sale of the property in September 2004--more than 90 days after the city sent its May and June notices to Walters--was entirely legal

(continued...)

new proceedings, after the ordinance's 90-day expiration date had passed, would require sending notice to the new owner then on file in the probate office.

### d.

In sum, the City of Montgomery has highly practical and inexpensive options for employing notice procedures reasonably certain to inform property owners that their property is unsafe and set to be demolished. First, it could search the <u>probate</u> office's records when it declares a property unsafe and sends notice to its owner. Second, it could <u>record</u> notice in the probate office that a property had been declared unsafe and subject to demolition, thereby alerting subsequent purchasers that the property is condemned. Third, should the building official's findings expire after 90 days pursuant to city ordinance, the city could check probate records again before reinitiating demolition proceedings to make sure

---

(...continued)
and valid.

that the new notice goes to the correct property owner.

The court is not holding that these procedures are the only means of complying with the due process clause. Rather, the court has identified them in order to demonstrate that there are "inexpensive and efficient mechanism[s]," Greene v. Lindsey, 456 U.S. 444, 455 (1982), available to the city in fulfilling its due process obligations.  These procedures are "relatively modest administrative burden[s]."  Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 800 (1983).

Here, the city pursued none of these options, and indeed provided no form of "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action."  Mullane, 339 U.S. at 314.  Ellis recorded his purchase of the Wade Street property as required by law; the city itself was therefore on 'record notice' of a change in ownership. See 1975 Ala. Code § 35-4-51.  Had the city bothered to check the property records in the probate office when it

reinitiated city-council proceedings in November 2004 (five months before the demolition occurred), it would have discovered that ownership of the property had changed. The court cannot conclude that Ellis was provided the notice required by the due process clause in this case.[5]

3.

This court is not aware of any Eleventh Circuit Court of Appeals case with facts similar to those presented here. However, such a case was decided <u>en banc</u> by the

---

5. The court does not base its conclusion that the notice it provided was inadequate solely on the fact that a better notice procedure was conceivable. <u>See</u> <u>Arrington</u>, 438 F.3d at 1350 ("Our task is not to determine whether the notice ... request[ed] would be <u>ideal</u> under all the circumstances, but rather whether the notice ... receive[d] is <u>reasonable</u> under all the circumstances."); <u>Cuvillier</u>, 390 F.3d at 1339 n.8 ("<u>Dusenbery</u> indicates that governments are not required to make the 'best' efforts, but only those that are 'reasonably calculated' to provide proper notice."). Rather, the court finds that the city's notice procedures were constitutionally inadequate, and additionally finds that relatively cheap and practical alternatives are available.

Eighth Circuit Court of Appeals, and the court finds its reasoning persuasive.  In <u>Kornblum v. St. Louis County</u>, 72 F.3d 661 (8th Cir. 1995) (en banc), the plaintiff brought a procedural due process claim against St. Louis County, under 42 U.S.C. § 1983, for not providing him adequate notice before demolishing his house.  The district court granted summary judgment for the county, but the court of appeals reversed.

The similarities between <u>Kornblum</u> and the case before this court are striking.  In <u>Kornblum</u>, as in this case, the governmental authority declared the property in question a public nuisance and commenced proceedings to have the nuisance abated.  72 F.3d at 662.  It sent notice to the then-owner of the property, but by the time the house was demolished the property had been purchased by someone else.  <u>Id</u>. at 662-63.  Approximately nine months elapsed between the county's checking property records to identify the owner and the ultimate demolition of the plaintiff's house.  <u>Id</u>.

24

In ruling for the Eighth Circuit <u>en banc</u> that notice to the previous property owners was inadequate under the due process clause, Judge Morris S. Arnold noted that the

> "delay in demolishing the property contributed significantly to the unreasonableness of the notice in this case. ... Because the County delayed a long time before it demolished the building, it created a foreseeable and appreciable risk that its action would affect a set of interested parties different from those whose interests were affected when the house was declared a nuisance."

<u>Id</u>. at 664. As previously discussed, the court believes that similar principles apply here.

In fact, at least one distinction between this case and <u>Kornblum</u> makes Ellis's case even stronger. In <u>Kornblum</u>, the plaintiff did not actually purchase the property until after the final hearing had taken place and the demolition order issued. <u>Id</u>. at 662. The court of appeals held that "some form of notice to <u>future</u> purchasers such as Mr. Kornblum was called for under the circumstances of this case." <u>Id</u>. at 663 (emphasis

25

added).  Here, unlike in <u>Kornblum</u>, the City of Montgomery reinitiated proceedings and ordered demolition after Ellis had already purchased the property.  The city's failure here was not to provide notice to future purchasers, but to provide notice to the person who actually owned the property at the time the city council hearing occurred.  If notice must be provided to future purchasers, then surely it must be provided to actual owners as well.[6]

Admittedly, one distinction between this case and <u>Kornblum</u> was that St. Louis County had failed to comply with its own ordinance that a declaration of public nuisance be filed with the recorder of deeds.  <u>Id</u>. at 662.  But of course the Eighth Circuit's decision did not

_____

6.  It is noteworthy that the dissenting opinion in <u>Kornblum</u> emphasized its disagreement with the majority's contention that "unidentifiable and unknown, future potential purchasers who have absolutely no interest in the property at the time of the hearing are constitutionally entitled to notice." <u>Kornblum</u>, 72 F.3d at 666 (Hansen, J., dissenting).  Since Ellis actually owned the Wade Street property at the time the city reinitiated its condemnation procedures on November 17, 2004, the dissenters' argument does not apply here.

turn on the facts that a notice procedure was already in place and that the county had violated it; the government does not violate procedural due process merely by violating its own procedures. Smith v. Georgia, 684 F.2d 729, 732 n.6 (11th Cir. 1982). Arguably, compliance with a preexisting ordinance is slightly easier than providing record notice without the benefit of an ordinance, but the administrative burdens involved are comparable in both cases--and, as previously mentioned, quite minimal. If anything, the appellate court's discussion of the recording ordinance in Kornblum confirms that there is a highly effective notice procedure available to the City of Montgomery that is "simple, straightforward, and virtually costless," Kornblum, 72 F.3d at 664.

### 4.

The City of Montgomery has advanced two additional arguments against Ellis's due process claim. First, the city states it should prevail because its notice

27

procedures were fully compliant with state and local law. Second, the city states that Ellis's agreement to purchase the property "as is" precludes relief. Both arguments are unavailing.

### a.

The city notes that the Alabama statute governing demolition procedures requires that the municipality send notice to only the "address on file in the tax collector's or revenue commissioner's office," and provides that "[t]he mailing of the certified or registered mail notice, properly addressed and postage prepaid, shall constitute notice as required herein." 1975 Ala. Code § 11-40-31. Pursuant to that statute, Montgomery, Ala. Ordinance No. 10-2001 provides for notice to "the person ... last assessing the property for ... taxes," and requires notice to be sent to the "addresses on file in the Montgomery County Revenue Commissioner's office <u>or</u> Montgomery County Probate

28

Judge's Office."  Ordinance No. 10-2001 at B(2) (emphasis added).  It therefore appears that the city, in sending notice to the property owner as reflected in the revenue commissioner's records, was following state and local law.

But, as previously stated, the State is not empowered to determine what constitutes adequate notice under the due process clause of the Federal Constitution. "[B]ecause minimum procedural requirements are a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action."  Logan, 455 U.S. at 432 (internal quotation marks and brackets omitted). Notwithstanding the language of the state statute, any notice procedure must be reasonably certain to inform real property owners of the pendency of demolition proceedings.  The city's notice procedure, at the time

Ellis's property was condemned and demolished, fell far short of that standard.

As previously discussed, the principal defect in the city's procedure was in using outdated records from the county revenue commissioner to identify property owners whose property it intended to demolish. Although maintaining property ownership records is among the duties of the revenue commissioner, the commissioner's purpose in keeping those records is distinctly different from that of the probate judge. The office of the revenue commissioner maintains records for the purpose of assessing and collecting property taxes, whereas the office of the probate judge maintains records for the purpose of definitively identifying real property ownership. Benchmark Resources Corp. v. United States, 64 Fed. Cl. 526, 535 (2005); see also 1975 Ala. Code § 35-4-50 ("Conveyances of property, required by law to be recorded, must be recorded in the office of the judge of probate.") (emphasis added).

30

This difference in the functions and purposes of the two offices should be obvious from the revenue commissioner's recordkeeping system as explained by Revenue Commissioner Spear at trial. Because the actual owner of any given piece of property is relevant only for tax assessment purposes beginning on October 1 of each year, and for tax collection purposes on October 1 of the following year, the revenue commissioner's computer records for each property identify the person from whom taxes were due to be collected on the previous October 1. As a result, the name listed with each property may be an outdated listing of who actually owns the property; indeed, it may be up to two years out-of-date. The revenue commissioner's records are designed to reflect property ownership for tax assessment and collection purposes, not for the purpose of identifying the current owner of real property.

As stated, before the city razes a structure, it must undertake reasonable measures to identify the owner of

record.  Consulting the official deeds and records at the office of the probate judge would satisfy this requirement.  Cf. Cuvillier, 390 F.3d at 1339 (approving tax office's consultation of local deeds and records in effort to identify property owner prior to tax sale). Therefore, even if the city followed state and local law in consulting the records of the county revenue commissioner, such actions did not constitute adequate notice under the due process clause of the Federal Constitution.

### b.

The city also argues that, because Ellis agreed to purchase the Wade Street property "as is," the city had no obligation to provide him with notice before destroying his house.  This is plainly wrong.

Under Alabama law, an "as is" clause in a purchase contract or deed serves to preclude any fraud claim by the purchase based on the seller's failure to disclose

32

material information.  <u>Moore v. Prudential Residential</u>
<u>Servs. Ltd.</u>, 849 So.2d 914, 924 (Ala. 2002).  But this
limits only the purchaser's ability to recover from the
seller; it does not relieve the city from its
constitutional obligation to provide adequate notice to
the current holder of property before destroying that
property.  As previously discussed, the city failed in
that obligation.  The terms of Ellis's purchase contract
and warranty deed are immaterial.

### B. Municipal Liability

Now that Ellis has established a violation of his
right to procedural due process, it remains to be seen
whether he will be able to recover from the City of
Montgomery under 42 U.S.C. § 1983.  It is well
established that there can be no respondeat superior
liability for § 1983 claims.  <u>Monell v. Dep't of Social</u>
<u>Servs.</u>, 436 U.S. 658, 691 (1978); <u>Holloman v. Harland</u>,
370 F.3d 1252, 1290 (11th Cir. 2004).  In other words,

33

the named defendant in a § 1983 suit may be held liable only for its own unconstitutional conduct, not that of subordinates or employees. <u>Monell</u>, 436 U.S. at 694.

The question is therefore whether the City of Montgomery itself violated Ellis's right to due process. A municipality is directly liable under § 1983 only if the violation of the plaintiff's rights is attributable to a municipal policy or custom. <u>Id</u>.  "The 'official policy' requirement [is] intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 479 (1986).  "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. ... A custom is a practice that is so settled and permanent that it takes on the force of law." <u>Sewell v. Town of Lake Hamilton</u>,

117 F.3d 488, 489 (11th Cir. 1997); <u>see also</u> <u>Board of</u>
<u>County Comm'rs v. Brown</u>, 520 U.S. 397, 403-04 (1997).
Formal policies that violate the Constitution are rare,
which means that most plaintiffs must allege an informal
custom that takes on the force of law.  <u>Grech v. Clayton</u>
<u>County</u>, 335 F.3d 1326, 1330 (11th Cir. 2003) (en banc).

In this case, the court is satisfied that the
deprivation of Ellis's due process right was caused by a
policy or custom within the meaning of <u>Monell</u> and its
progeny.  According to the uncontroverted testimony of
Dorian Brunson, the city's chief building official, the
city's policy and practice for providing pre-demolition
notice to property owners is to access the revenue
commissioner's property records, even though the city is
aware that those records are not up-to-date.  Brunson
testified that the city has no other policy to discover
whether the property in question has changed ownership.

Based on this evidence, the court concludes that, at
the time Ellis was denied due process, it was the city's

policy or custom to rely on property records from the revenue commissioner's office even though the name listed on those records may not reflect the actual owner of a given property. The evidence also reflects that the city had no other policy or custom in place to reduce the likelihood that property would be demolished without owners receiving notice of the pending action.

If the city had produced evidence that the inadequate notice procedure employed in Ellis's case was merely an oversight by a negligent municipal employee, then the city would have a stronger defense against direct municipal liability under § 1983. But, because it appears that the city itself is responsible for not providing Ellis the notice he was due, the city is not shielded from liability in this case.


### III. RELIEF

Ellis's complaint seeks compensatory damages, punitive damages, attorneys' fees and expenses, and

declaratory and injunctive relief.   The court will address each form of relief requested in turn.


### A. Compensatory Damages

"If the government fails to comply with the dictates of the Due Process Clause, the aggrieved party can seek compensatory damages ... under 42 U.S.C. § 1983." Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003). "Recovery of damages is limited to those injuries proved to be caused by the defendant[]."   Troupe v. Sarasota County, 419 F.3d 1160, 1165 (11th Cir. 2005).

Based on the evidence presented at trial, the court finds the following facts.   Prior to the fire that severely damaged the house and rendered it unsafe, the house was assessed as having a fair market value of $ 29,000.   After the fire, Ellis paid $ 4,500[7] for the

---

7. At trial, Ellis testified that the purchase price was $ 4,600.  A copy of the warranty deed, submitted as evidence at the summary-judgment stage and admitted into evidence at trial by stipulation of the parties, reflects a purchase price of $ 4,500.  The court assumes Ellis was

(continued...)

house.   Ellis believes that although he paid only $ 4,500, it was worth approximately $ 15,000.   He attributes the difference to the fact that the house was sold at a foreclosure sale subject to the statutory redemption rights of Walters, and that the damage to the house from the fire appeared to be worse than it actually was.  Although Ellis's estimate of the house's value when he purchased it is imprecise at best, the court credits it for lack of any other reliable evidence of its value at the time.

Ellis also testified that he would have repaired the house for an additional $ 15,000 and rented it out to tenants for $ 450 per month.  Aside from clearing some debris from the property, Ellis had not begun substantial repairs on the house at the time it was destroyed by the city.

The property, with the house gone, is now assessed at a fair market value of $ 6,000.  A lien for the

---

(...continued)
simply mistaken during his testimony.

38

demolition fee of $ 2,790 plus interest is currently attached to the property.

Based on this evidence, the court concludes that Ellis is entitled to compensatory damages of $ 11,790, plus whatever interest has accrued on the cost-of-demolition lien.  This sum is reached by calculating the difference between the value of the house when Ellis purchased it and the value of the property, which Ellis still owns, now that the house has been destroyed.  As stated, the court credits Ellis's estimate that the house was worth $ 15,000 when he bought it.  As for the value of the property now, it is currently assessed at $ 6,000, but a $ 2,790 lien for the costs of demolition is attached, reducing its total value to $ 3,210.  The difference between $ 15,000 and $ 3,210 is $ 11,790.

Alternatively, should the city find it administratively convenient simply to waive the demolition fee and cancel the lien, total damages would be reduced to $ 9,000--the difference between $ 15,000

39

and $ 6,000, or the loss of value in Ellis's property caused by the destruction of his house.

Although Ellis may have lost a year or more in revenue from rent, the court is not convinced that this would have made up for the cost of repairs to the house-- repairs Ellis never made.  While it is true that revenue from rent would have eventually paid for repairs, such future income is too speculative and remote.  Damages under § 1983 are "ordinarily determined according to principles derived from the common law of torts." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 (1986).  In this case, that common law is reflected in the law of Alabama.  Under current Alabama law, recovery for loss of future profits requires that the future profits be proved with "reasonable certainty."  Super Valu Stores, Inc. v. Peterson, 506 So.2d 317, 327 (Ala. 1987).  The court finds that Ellis's testimony that he expected to rent out the house once he had completed repairs does not meet that standard.  The court therefore

declines to award additional damages based on future rental income.  In any event, the court suspects that Ellis's expectation of future rental income was captured by the value of the house when it was purchased--value that is now incorporated into the damages Ellis is due.

### B. Punitive Damages

Municipalities are immune from punitive damages under 42 U.S.C. § 1983.  <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 271 (1981).  Therefore, Ellis cannot recover punitive damages from the city in this case.

### C. Attorneys' Fees and Expenses

As the "prevailing party" in a civil action under § 1983, Ellis is entitled to reasonable attorneys' fees and expenses.  42 U.S.C. § 1988(b).  The court will give the parties an opportunity to agree on the amount of such fees and expenses.

41

### D. Declaratory and Injunctive Relief

As discussed, the principal defect in the city's notice procedure was to rely on out-of-date public records of the county revenue commissioner rather than the up-to-date title and deed records of the probate judge. The court will enter a declaration to that effect. At trial, Revenue Commissioner Spear testified that very recent technological improvements at her office now enable the city to learn of a change in property ownership as soon as it occurs. In addition to making note of this development, the court is confident that the city, in reading this opinion, has every incentive to devise notice procedures compliant with due process. Accordingly, the court declines to afford injunctive relief in conjunction with this case.

### IV. CONCLUSION

For the foregoing reasons, the court finds in favor of Ellis and against the City of Montgomery, and will

**42**

afford Ellis declaratory relief, damages, fees, and costs.   An appropriate judgment will be entered in accordance with this opinion.

DONE, this the 7th day of November, 2006.


    /s/ Myron H. Thompson
**UNITED STATES DISTRICT JUDGE**